*/09*

United States District Court
Southern District of Texas
FILED

DEC 2 3 1999

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| HECTOR A. CASAS | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | B-96-207 |
| AMERICAN AIRLINES, INC., | § | |
| | § | JURY |
| DEFENDANT. | § | |

## AMERICAN'S BRIEF REGARDING RECENT DEVELOPMENT

TO THE HONORABLE JUDGE OF SAID COURT:

American brings to the Court's attention a recent development which American Airlines believes confirms that nothing in 14 CFR § 254 declares unenforceable American's longstanding contractual exclusion of liability for certain baggage items, such as videocameras.

### I.

As the Court knows, it is plaintiff's position that 14 CFR § 254 was intended by the Civil Aviation Board ("CAB") to render unenforceable the ticket exclusions of all airlines. As American has consistently argued, plaintiff's position certainly was not the position of the federal agency when it originally considered the rule in 1982. As the CAB explained in its "Reasons for Adopting" part 254:

> The Board is raising the liability limitation from $750 to $1000 because of the significant inflation of consumer prices over the last 6 years since the limitation was set. The Board finds that $1000 is a more reasonable limitation, which will benefit passengers without a significant burden on carriers. Passengers are

1

guaranteed that air carriers will not unreasonably limit their liability for lost, damaged or delayed baggage. <u>They will receive notice of any items, such as fragile or perishable goods, that are excluded from the coverage</u>.

47 Fed. Reg. 52987, 52990 (November 24, 1982) (emphasis added).[1] This interpretation by the agency -- that passengers are to receive <u>notice</u> of exclusions and <u>not</u> that exclusions are invalid -- has never changed.

## II.

Just recently, on December 17, 1999, the Department of Transportation ("DOT") reconsidered the baggage liability limitations set forth in Section 254. Primarily because of inflation, the DOT amended section 254 to raise the baggage liability limit to $2,500 from the existing $1,250 per passenger. 64 Fed. Reg. 70753-76 (December 17, 1999). Of course, the DOT has long known that American and other airlines excluded liability for losses of certain items of baggage. Yet, the DOT has never taken action against American for enforcing its exclusion, nor has it changed section 254 to declare exclusions are invalid. While recently considering changes to Section 254, the DOT was once again specifically reminded of the airlines' contractual term excluding coverage for certain losses such as cameras. Specifically, on August 24, 1999, Ms. Nancy Wagner, as a part of the proposed rulemaking to amend section 254, complained to the DOT about the airlines' exclusion of liability. Despite specifically

---

[1]In November 1982, the Board initially proposed a baggage liability limit of $1,000; when the rule finally became effective on April 10, 1984, the limit was increased to $1,250 per passenger. 49 Fed. Reg. 5065 (February 10, 1984).

knowing of the airlines' exclusion, the DOT did not change section 254 to declare the exclusion unlawful.[2]

If section 254 had in fact declared such exclusions illegal in 1984 (as plaintiff contends), and with this specific knowledge that airlines, including American, were enforcing the exclusions, then surely the DOT, the agency charged with enforcing § 254, would have taken action to change such practices.   The fact that the DOT took no action in the face of such knowledge is strong evidence that American's position that the exclusion is valid and that the plaintiff's position is erroneous.

### III.

Attached hereto is a copy of the December 17, 1999 Federal Register concerning section 254 and Ms. Wagner's August 24, 1999 letter.

WHEREFORE, PREMISES CONSIDERED, Defendant American Airlines, Inc. respectfully prays that the Plaintiff take nothing of and from American and that American obtain further relief at law or in equity, to which it is justly entitled.

---

[2]     The only change by the DOT was to increase the baggage liability limit to $2,500.00.

Respectfully submitted,

JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, Texas  75202
(214) 953-6000
(214) 953-5822 (Telecopy)

By: _____

David T. Moran
State Bar No. 14419400

Jorge C. Rangel
State Bar No. 16543500
The Law Offices of Jorge C. Rangel
719 S. Shoreline Blvd., Ste. 501
Corpus Christi, Texas 78403
(512) 883-8500
FAX (512) 883-2611
ATTORNEYS FOR DEFENDANT
AMERICAN AIRLINES, INC.

4

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of American's Brief Regarding Recent Development has been served upon the Plaintiff's counsel of record by certified mail, return receipt requested, on this 22nd day of December, 1999.

Heriberto (Eddie) Medrano
Attorney at Law
1101 West Tyler
Harlingen, Texas  78550

_____
David T. Moran

2369480.1

5

Case 1:96-cv-00207  Document 109  Filed in TXSD on 12/23/1999  Page 6 of 10

68926

## DEPARTMENT OF TRANSPORTATION

### Office of the Secretary

**14 CFR Part 254** _42

[Docket No. OST–1996–1340, formerly Docket 41690]

**RIN 2105–AC07**

### Domestic Baggage Liability

**AGENCY:** Office of the Secretary, DOT .
**ACTION:** Final Rule.

**SUMMARY:** The Department is amending its rule governing the minimum amount to which U.S. carriers may limit their liability to passengers for lost, damaged, or delayed baggage in domestic air transportation. We are raising the minimum liability limit from $1250 to $2500. Also, to keep the minimum liability limit current, the Department will review the Consumer Price Index for All Urban Consumers every two years and adjust the minimum limit if necessary. Doubling the current minimum limit to $2500 reflects judgments by the Department and some in Congress about fairness and the current value of some consumer baggage claims. The Department's intent in adopting the higher minimum limit is to offer consumers a more reasonable level of protection while continuing to allow airlines to limit their exposure to extraordinary claims.

**DATES:** This rule will become effective on January 18, 2000.

**FOR FURTHER INFORMATION CONTACT:** Joanne Petrie, Office of Regulation and Enforcement, Office of the General Counsel, U.S. Department of Transportation, 400 Seventh Street, SW, Washington, DC 20590, (202) 366-9315.

**SUPPLEMENTARY INFORMATION:**

### Background

Part 254 of Title 14 of the Code of Federal Regulations (Part 254) puts a floor under the amount to which an air carrier may limit its liability for loss, damage, or delay in the carriage of passenger baggage in domestic air transportation. The rule applies to both charter and scheduled service. It provides, "[i]n any flight segment using large aircraft [any aircraft designed to have a maximum passenger capacity of more than 60 seats], or on any flight segment that is included on the same ticket as another flight segment that uses large aircraft, an air carrier shall not limit its liability for provable direct or consequential damages resulting from the disappearance of, damage to, or delay in delivery of a passenger's

personal property, including baggage, in its custody to an amount less than $1250 for each passenger." 14 CFR 254.4 (1999).

In addition, Part 254 requires a carrier to provide certain types of notice to passengers. It provides, "[i]n any flight segment using large aircraft, or on any flight segment that is included on the same ticket as another flight segment that uses large aircraft, an air carrier shall provide to passengers, by conspicuous written material included on or with its ticket, either: (a) Notice of any monetary limitation on its baggage liability to passengers; or **(b)** The following notice: "Federal rules require any limit on an airline's baggage liability to be at least $1250 per passenger." 14 CFR 254.5 (1999).

The minimum liability limit was last amended by a final rule, issued by the Civil Aeronautics Board (CAB) before its "sunset," in 1984. ER–1374, 49 FR 5065, February 10, 1984. The $1250 figure was based on the increase in the Consumer Price Index for All Urban Consumers" (CPI–U) between the date of the previous amendment in May 1977 and September 1983. When setting the minimum limit, the CAB attempted to determine the amount necessary to cover the value of passengers' baggage while still allowing air carriers to protect themselves from extraordinary claims.

### Regulatory History of the Current Proposal

In 1993, Public Citizen and the Aviation Consumer Action Project (ACAP) petitioned the Department to raise the minimum liability limit to $1850. In response to the petition, the Department issued a notice of proposed rulemaking (NPRM), requesting comment on three proposals. 59 FR 49868, September 30, 1994.

The first proposal would have raised the minimum liability limit to $1850. To assess the economic effects of this figure on the industry, the Department requested that air carriers submit annual data on 1993 domestic baggage claims. The second proposal would have raised the minimum liability limit to $1850 with a mechanism that provided for periodic future increases based on the CPI–U. The third proposal would have raised the minimum liability limit to $2000. Comments and baggage data were due on November 29, 1994.

In November 1994, the Air Transport Association (ATA) asked for an extension of the November 29, 1994, deadline. In response, the Department declined to alter the deadline for submission of baggage data, but agreed

to publish the baggage data in the docket in aggregate form and to extend the comment period for 30 days after such publication. 59 FR 60926, November 29, 1994. The Department received several comments, which are accessible, along with the aggregate baggage data and other rulemaking documents, at the Department's Docket Management System website (http://dms.dot.gov) in Docket No. OST–1996–1340. In 1998, ACAP filed an updated petition requesting that the Department raise the minimum liability limit, recalculated with the then-current CPI–U index, to $2,100.

On June 28, 1999, the Department issued a supplemental notice of proposed rulemaking (SNPRM) that proposed to double the minimum liability limit to $2,500 with an adjustment mechanism using the CPI–U. The Department based the proposed amount of the minimum limit on the Administration's legislative proposal, titled the "Airline Passenger Fair Treatment Initiative," as well as the minimum liability limit Congress considered in H.R. 780. The Department selected the CPI–U as the basis for future increases because it is the best available measure of the current-dollar replacement cost to a consumer for replacing lost, damaged, or delayed items in checked baggage.

In order to keep the minimum liability limit current, the Department proposed that it would review the CPI–U every two years following the issuance of a final rule in this proceeding. The Department would increase the minimum liability limit (rounded to the nearest $100 for simplicity), if necessary, based on the July CPI–U of the second year following the previous amendment. Under this process, the Department would announce the increase by publishing a final rule in the Federal Register in early fall of the second year. Because this would merely reflect a mathematical computation of the minimum liability limit using the CPI–U, the Department would not need to first publish a proposed rule. The new minimum liability limit and the revised notice requirement would be effective on the following January 1.

### Comments Received on the SNPRM

As part of the airline industry's Airline Customer Service Commitment, released on June 17, 1999, the Air Transport Association (ATA) petitioned the Department to increase the minimum liability limit. ATA represents the airlines that carry roughly 95 percent of the nation's air travelers. In comments that ATA filed separately

CUtePDF  www.cutepdf.com

Case 1:96-cv-00207  Document 109  Filed in TXSD on 12/23/1999  Page 7 of 10

from its petition, it supports the increase in the minimum liability limit to $2500. ATA's opinion is, however, that the CPI–U does not reflect accurately the effect of inflation on contents of baggage and should, therefore, not be used to adjust the minimum liability limit. Since "most of the contents of baggage are apparel," ATA asserts that the apparel component of the Consumer Price Index (CPI) is a more sensible index to use to adjust the minimum liability limit. To address concerns that air travelers also often pack relatively more expensive electronic equipment in their checked baggage, ATA points out that the video and audio component of the CPI is more stable than that for apparel. Using the apparel component of the CPI would not, therefore, disadvantage travelers with respect to non-apparel items in their checked baggage. Atlantic Southeast Airlines (ASA) also opposes using the CPI–U to adjust the minimum liability limit. ASA asserts that passenger baggage generally contains clothing and personal hygiene products, whose rate of inflation tends to be lower than for many items included in the aggregate CPI–U.

Trans World Airlines, Inc. (TWA) supports the proposed $2500 minimum liability limit, but believes the Department should reconsider its proposal to adjust the minimum limit every two years. Because the inflation rate has been, in recent years, very low, TWA suggests that the Department revise the minimum limit, if necessary, every five years instead.

The Regional Airline Association (RAA), which is not a party to the Airline Customer Service Commitment, does not support the Department's proposal to increase the minimum liability limit to $2500. The RAA questions whether the DOT's minimum liability limits have ever accurately reflected the value of the contents of passengers' baggage. Further, the RAA, like the ATA, argues that the CPI–U is the wrong measure of inflation to use to adjust the minimum liability limit since it includes more than apparel, which the RAA asserts is the primary component of passengers' baggage.

Sky Trek International Airlines (Sky Trek) is opposed to the Department's proposal to amend its domestic baggage liability rule. Sky Trek states, "[T]he airlines themselves should determine the extent to which baggage liability should affect their product's marketability." Further, Sky Trek argues that, contrary to the Department's assertion, domestic carriers have actively improved their baggage handling systems. Sky Trek bases this

argument on the Department's statistics that indicate a steady number of mishandled baggage complaints in the face of dramatic increases in enplanements from 1993 through 1998.

Also, Sky Trek believes that most mishandled baggage is the result of employee misconduct. Sky Trek suggests, therefore, that the Department permit a portion of Passenger Facility Charges (PFCs) to be used to enhance security in those airport areas where baggage is most at-risk of loss or damage. Further, Sky Trek suggested that an airline task force, not the Department, should establish industry guidelines for resolving damaged baggage claims.

The Luggage and Leather Goods Manufacturers of America, Inc. (LLGMA) supports both the proposed increase in the minimum liability limit and the biannual update mechanism. LLGMA represents over 300 producers, distributors, and retailers of travel goods, including luggage. LLGMA's comments express a concern, however, that these measures will contribute further to the passing back of repair or replacement costs to its members by air carriers. LLGMA accused the airlines of failing to improve their baggage handling systems and causing most of the damage to passengers' baggage.

LLGMA made the following recommendations to prevent the airlines from evading responsibility for their actions that result in damaged baggage. First, LLGMA urges the Department to monitor airline claims departments closely to determine whether airlines are accepting responsibility for bags that their baggage handling systems damage. Second, LLGMA recommends that the Department report in its monthly Air Travel Consumer Report (ATCR) the number of mishandled baggage complaints that involve damage. LLGMA also requests that the ATCR include information on the resolution of these complaints. LLGMA asserts that these measures will encourage the airlines to improve their baggage handling systems and provide LLGMA with information it needs to determine the frequency of damaged baggage and whether airlines are resolving the damaged baggage complaints.

Several airline passengers, such as Rita Altamore, wrote to support the increase in the minimum liability limit as long overdue. Emmett Scully suggests that the proposed figure of $2500 is too low. Several of these passengers note that stricter enforcement of carry-on baggage limitations forces them to check more of their belongings. Joan Junger comments that some elderly passengers or passengers with disabilities must

place all their belongings in checked baggage since they may be unable to carry carry-on baggage. Further, Walter and Christa Barke and an anonymous commenter urge airlines to prevent loss and damage to baggage by doing things such as securing baggage areas and requiring persons to show baggage claim checks before leaving secured areas.

Finally, ATA further suggests that the Department redraft the notice requirement in 14 CFR 254.5 to state that the Department has established the minimum liability limit at $2500, that the amount is subject to periodic revision, and that passengers should consult their travel agents or airlines for further information. ATA asserts that this kind of notice would disclose clearly and directly to passengers the minimum liability limit without requiring repeated revisions to ticket stock and related documents. Alternatively, TWA suggests that the Department permit airlines to deplete existing ticket stock when the minimum liability limit changes, since the old stock would disclose a lower than actual minimum liability limit, which would not result in any harm to consumers.

### DOT's Response to the Comments

The Department's proposal to double the current minimum liability limit to $2500 reflects the Department's judgment about fairness and the current value of some baggage claims. Some members of Congress also considered $2500 to be an appropriate minimum limit. H.R. 780, 106th Cong. § 101(a) (1999). Further, ATA, in its Airline Customer Service Commitment, vowed to support this increase in the minimum liability limit. Also, the Department applauds both American Airlines and Midwest Express Airlines for voluntarily raising their minimum liability limits in advance of this rule.

Although the CPI–U includes many goods and services that are not associated with passengers' baggage, the apparel component of the CPI–U also does not accurately reflect the wide variety of items passengers pack in their luggage. The Department believes the CPI–U is the proper index to use for its proposed biannual updates of the minimum liability limit. The CPI–U reflects spending patterns for approximately 80 percent of the U.S. population. The CPI–U is the best measure for adjusting payments to consumers when the intent is to allow consumers to purchase the same items in current dollars. Since no single index or component of an index covers all items in passengers' baggage, the aggregate CPI–U is the best available measure of the cost to passengers of

replacing their belongings when an airline loses, damages, or delays their baggage.

The Department recognizes that airlines often order ticket stock and related documents that contain the baggage liability notice that Part 254 requires in bulk to receive discounted rates. Under this rule, the Department will review the minimum liability limit every two years. Since the Department will always round the minimum liability limit to the nearest hundred-dollar amount, however, the minimum limit will likely not change every two years. If, as TWA suggests, the inflation rate continues to remain steady, uncertainty involving the amount of the minimum liability limit will not be as burdensome as ATA and TWA represent. The Department continues to believe that notice to consumers of the minimum liability limit, as 14 CFR 254.5 requires, should contain the current minimum liability limit.

For a reasonable time, however, the Department will not enforce the notice requirement in § 254.5 while airlines deplete their current ticket stock that contains the old minimum liability limit. During this time, the Department encourages airlines to use inserts or other means to notify passengers of the new $2500 minimum liability limit.

As a final matter, the Department wishes to call attention to a change in the formula used to adjust the minimum liability limit from the formula published in the SNPRM. The formula in this final rule is merely a technical correction to reflect the Department's description of the adjustment mechanism in the preambles of the SNPRM and this final rule.

Regulatory Analyses and Notices

*E.O. 12866 and DOT Regulatory Policies and Procedures*

The Department has determined that this action is not a significant regulatory action under Executive Order 12866 or under the Department's Regulatory Policies and Procedures. Interested parties can access the regulatory evaluation that examines the projected costs and impacts of the proposal in the docket (OST–1996–1340). Since this final rule is the same as the proposed rule and since we have received no comments providing information that warrants changing any of the analysis, the Department has decided to adopt the draft regulatory evaluation as final.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (5 U.S.C. 601 *et seq.*) requires a review of rules to assess their impact on small

entities. The Department certifies that this rule will not have a significant economic impact on a substantial number of small entities. The Department received no comments in response to the SNPRM on potential impacts on small entities. By its express terms, the rule applies only to flight segments that use large aircraft, or on any flight segment that is included on the same ticket as another flight segment that uses large aircraft. Few, if any, air carriers operating large aircraft would qualify as small entities. The rule could apply to some air carriers that might be considered small entities to the extent that they interline or codeshare with large air carriers. Based on our analysis, we also do not believe this rule would have significant economic impact because most claim payments are currently well below the existing $1250 minimum liability limit. Claimants still need to demonstrate the extent of their actual losses and are not automatically entitled to compensation at the higher level.

*Federalism Implications*

The Department believes that a federalism assessment is unnecessary since this rule does not have sufficient federalism implications under Executive Order 13132.

*Compliance with the Unfunded Mandates Reform Act of 1995*

Pursuant to the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), each federal agency "shall, unless otherwise prohibited by law, assess the effects of Federal Regulatory actions on State, local, and tribal governments, and the private sector (other than to the extent that such regulations incorporate requirements specifically set forth in law)." Sec. 201. Section 202 of the Unfunded Mandates Reform Act further requires that "before promulgating any general notice of proposed rulemaking that is likely to result in promulgation of any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any 1 year, and before promulgating any final rule for which a general notice of proposed rulemaking was published, the agency shall prepare a written statement" detailing the effect on state, local, and tribal government and the private sector. Since this rule does not result in an unfunded mandate, the Department did not prepare a statement.

List of Subject in 14 CFR Part 254

Air carriers, Consumer protection, Reporting and recordkeeping requirements.

For reasons set forth in the preamble, the Department amends 14 CFR Part 254 as follows:

**PART 254—DOMESTIC BAGGAGE LIABILITY**

1. The authority citation for part 254 is revised to read as follows:

**Authority:** 49 U.S.C. 40113, 41501, 41504, 41510, 41702, and 41707.

§ 254.1 [Amended]

2. In § 254.1, the phrase "and overseas" is removed and the phrase "and intrastate" is added in its place.

§ 254.2 [Amended]

3. In § 254.2, the phrase "or overseas" is removed and the phrase "or intrastate" is added in its place.

4. Section 254.4 is revised to read as follows:

§ 254.4  Carrier liability.

On any flight segment using large aircraft, or on any flight segment that is included on the same ticket as another flight segment that uses large aircraft, an air carrier shall not limit its liability for provable direct or consequential damages resulting from the disappearance of, damage to, or delay in delivery of a passenger's personal property, including baggage, in its custody to an amount less than $2500 for each passenger.

§ 254.5 [Amended]

5. In § 254.5(b), the amount "$1250" is revised to read "$2500."

6. Section 254.6 is added to read as follows:

§ 254.6  Periodic Adjustments

The Department of Transportation will review the minimum limit of liability prescribed in this part every two years. The Department will use the Consumer Price Index for All Urban Consumers as of July of each review year to calculate the revised minimum liability amount. The Department will use the following formula:

$2500 x (a/b) rounded to the nearest $100 where:

a = July CPI–U of year of current adjustment

b = Most current CPI–U figure when final rule is issued.

Issued in Washington. DC under authority delegated by 49 CFR 1.56a(h)2 on December 13, 1999.

**Robert Goldner,**

*Acting Deputy Assistant Secretary for Aviation and International Affairs.*

[FR Doc. 99–32782 Filed 12–16–99; 8:45 am]

BILLING CODE 4910–62–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Food and Drug Administration**

**21 CFR Part 558**

**New Animal Drugs for Use in Animal Feeds; Neomycin Sulfate**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is amending the animal drug regulations to reflect approval of a supplemental new animal drug application (NADA) filed by Pharmacia & Upjohn Co. The supplemental NADA provides for use of neomycin sulfate Type A medicated articles to make Type B and C medicated feeds for cattle, swine, sheep, and goats, and medicated milk replacers for calves, piglets, lambs, and goat kids.

**EFFECTIVE DATE:** December 17, 1999.

**FOR FURTHER INFORMATION CONTACT:** Dianne T. McRae, Center for Veterinary Medicine (HFV–102), Food and Drug Administration, 7500 Standish Pl., Rockville, MD 20855, 301–827–0212.

**SUPPLEMENTARY INFORMATION:** Pharmacia & Upjohn Co., 7000 Portage Rd., Kalamazoo, MI 49001–0199, filed supplemental NADA 140–976 that provides for use of neomycin sulfate Type A medicated articles to make Type B and C medicated feeds for cattle, swine, sheep, and goats, and medicated milk replacers for calves, piglets, lambs, and goat kids, for treatment and control of colibacillosis (bacterial enteritis) caused by *Escherichia coli* susceptible to neomycin. The products were the subject of a National Academy of Sciences/National Research Council (NAS/NRC) Drug Efficacy Study Group review of the product's effectiveness (DESI 11–315V). The results of the NAS/NRC review and FDA's conclusions based on that review were published in the Federal Register of January 19, 1971 (36 FR 837). The sponsor filed a supplemental NADA that reflects compliance with the results of the NAS/NRC review and FDA's conclusions based on that review. The supplement is approved as of November 3, 1999, and 21 CFR 558.364 is added to reflect the approval. The basis for approval is discussed in the freedom of information summary.

Also, 21 CFR 558.4 is amended in the "Category II" table in paragraph (d) to add an entry for neomycin sulfate.

In accordance with the freedom of information provisions of 21 CFR part 20 and 514.11(e)(2)(ii), a summary of safety and effectiveness data and information submitted to support approval of this application may be seen in the Dockets Management Branch (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852, between 9 a.m. and 4 p.m., Monday through Friday.

FDA has determined under 21 CFR 25.33(a)(3) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

This rule does not meet the definition of "rule" in 5 U.S.C. 804(3)(A) because it is a rule of "particular applicability." Therefore, it is not subject to the congressional review requirements in 5 U.S.C. 801–808.

**List of Subjects in 21 CFR Part 558**

Animal drugs, Animal feeds.

Therefore, under the Federal Food, Drug, and Cosmetic Act and under the authority delegated to the Commissioner of Food and Drugs and redelegated to the Center for Veterinary Medicine, 21 CFR part 558 is amended as follows:

## PART 558—NEW ANIMAL DRUGS FOR USE IN ANIMAL FEEDS

1. The authority citation for 21 CFR part 558 continues to read as follows:

**Authority:** 21 U.S.C. 360b, 371.

2. Section 558.4 is amended in the "Category II" table in paragraph (d) by adding an entry alphabetically for neomycin sulfate as follows:

**§ 558.4   Medicated feed applications.**

\*   \*   \*   \*   \*

(d) \* \* \* \*

### Category II

| Drug | Assay limits percent' type A | Type B maximum (100x) | Assay limits percent' type B/C² |
|---|---|---|---|
| Neomycin sulfate | 80–120 | 100 g/lb (22.0%) | 70–125 |

¹Percent of labeled amount.

²Values given represent ranges for either Type B or Type C medicated feeds. For those drugs that have two range limit, the first set is for Type B medicated feed and the second set is for a Type C medicated feed. These values (ranges) have been assigned in order to provide for the possibility of dilution of a Type B medicated feed with lower assay limits to make a Type C medicated feed.

\*   \*   \*   \*   \*

3. Section 558.364 is added to subpart B to read as follows:

**§ 558.364   Neomycin sulfate.**

(a) *Approvals.* Type A medicated article: 325 grams per pound to 000009 in § 510.600(c) of this chapter.

(b) *Related tolerances. See* § 556.430 of this chapter.

(c) [Reserved]

(d) *Conditions of* use. Neomycin sulfate is used as follows:

62474        # ORIGINAL

GENERAL COUNSEL CORPORATION
DOCKETS SECTION

99 AUG 31   PM 2: 43

**NANCY B. WAGNER**
**2508-A RANCHO SIRINGO DRIVE**
**SANTA FE, NM 87505-5533**
**VOICE/FAX 5054244989**
**EMAIL: 71563,314@compuserve.com**

August 24, 1999

**Dockets Management system**
U.S. Dept. of Transportation
400 Seventh St., N. W., Plaza 40 1
Washington, D.c. 20590-0001

Gentlemen:

Case No. OTS- 1996-1340 - *39*

Following are my comments regarding this proposed increase domestic liability increase for lost, delayed or damaged luggage:

This is certainly is called for as the $1250 limits years old, and inflation has certainly increased the value of contents.

Also, the carriers deny liability for valuables, electronics, medicines and fragile items in checked luggage. However, since they require these items to be placed in carry-on luggage, they should be required to accept liability when they make you check carry-on luggage. I comply with their requirements, having only two carry on pieces (or less). On several occasions, I have been required to check my carry-on bag (without any notice) which contains my jewelry, cameras, medications and other valuable or fragile items Since thieves would certainly be aware that gate-checked items would be more likely to contain items in the above-mentioned categories, these bags are logically subject to a higher exposure to loss.

I have inquired with Continental, Southwest, American and Delta who all advise me that they will deny liability for these items even when the passenger is forced to check them by the gate personnel of the airlines. This certainly doesn't seem fair to me.

If these comments belong in another docket, please transfer them to the appropriate docket

Sincerely,

Nancy B Wagner